# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PILOT AIR FREIGHT, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2019-0992-JRS** |
| | ) | |
| MANNA FREIGHT SYSTEMS, INC., | ) | |
| ALAN J. MEEHAN REVOCABLE TRUST, | ) | |
| and ALAN J. MEEHAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 2, 2020
Date Decided: September 18, 2020

Jody C. Barillare, Esquire of Morgan, Lewis & Bockius LLP, Wilmington, Delaware and Troy S. Brown, Esquire, Margot G. Bloom, Esquire and Brian F. Morris, Esquire of Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiff Pilot Air Freight, LLC.

Kurt M. Heyman, Esquire and Melissa N. Donimirski, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Michael F. Cockson, Esquire and Nathaniel J. Zylstra, Esquire of Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota, Attorneys for Defendants Manna Freight Systems, Inc., Alan J. Meehan Revocable Trust and Alan J. Meehan.

**SLIGHTS, Vice Chancellor**

This Action involves disputes relating to an Asset Purchase Agreement (the "APA") whereby Plaintiff, Pilot Air Freight, LLC ("Pilot"), purchased substantially all the assets of Defendant, Manna Freight Systems, Inc. ("Manna," or the "Company") (the "Acquisition").[1] As to be expected, Manna and its direct and indirect owners, Defendants, Alan J. Meehan Revocable Trust u/a/d/ 8/20/2007 (the "Trust") and Alan J. Meehan ("Meehan"), as sellers, made contractual representations and warranties in the APA to Pilot, as buyer, regarding the fitness of Manna's trucking business.[2] The parties agreed that Sellers would indemnify Pilot for any breaches of the representations and warranties,[3] and that any claim for indemnification must be filed within 15 months of the APA's closing.[4] Apart from Sellers' contractual representations and warranties, however, Pilot promised it was not relying on *any* extra-contractual promises, representations or warranties.[5]

---

[1] Verified Compl. Under Seal ("Compl.") (D.I. 1) ¶¶ 1–4; Compl. Ex. A (the "APA").

[2] *See, e.g.*, Compl. ¶ 35; APA Art. 5 ("Each of Seller, the Trust and Meehan jointly and severally represent . . . ."). Meehan and the Trust together are referred to in the APA as "Owner." The APA designates Manna as "Seller." Throughout this Opinion, when quoting from the APA, I will follow this convention. For ease of reference, however, I designate Manna and the Owner, collectively, as "Sellers" when addressing Sellers' representations and warranties in order to avoid repeated references to "Seller, the Trust and Meehan jointly and severally" as the actual parties who made the "Representations and Warranties By Seller" as per the APA. APA Art. 5.

[3] APA § 9.1 ("Indemnification by Seller").

[4] APA § 9.1, § 9.3 ("Survival").

[5] APA § 9.8 ("Limitation of Representations and Warranties").

1

A significant aspect of Pilot's thesis in support of the Acquisition was that it could "market its [own] logistics services to Manna's customers and therefore expand its customer base."[6] Given the "critical importance" of Manna's existing customer relationships, a significant component of Pilot's valuation of Manna was Manna's "projected future customer revenues."[7] To buttress its valuation, Pilot bargained for a specific representation regarding the stability of the Company's relationship with its "30 largest customers for calendar year 2017."[8] It also bargained for post-signing protection in the form of a representation that, between signing and closing, Sellers had not received notice from any of Manna's top customers of an intent materially to decrease the volume of business with the Company.[9]

The Acquisition closed on July 16, 2018. More than fifteen months later, on December 11, 2019, Pilot filed this Action alleging fraud, breach of representations and warranties and breach of the implied covenant of good faith and fair dealing.[10] According to Pilot, at some point after closing, it discovered that three of the

---

[6] Compl. ¶ 2.

[7] *Id.*

[8] APA § 5.27 ("Customers").

[9] Compl. ¶ 25; APA § 5.27.

[10] Compl. ¶ 96(a) (alleging Sellers breached various representations and warranties).

Company's top customers from 2017 were "no longer [] customer[s] at all."[11] This discovery has prompted Pilot to allege that Sellers "initiated a scheme to misrepresent to Pilot the declining or essentially ended nature of certain of its material customer relationships" as soon as Sellers realized "the value Pilot placed" on Manna's customer relationships.[12]

Manna has moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state viable claims. According to Manna, the indemnification claims are untimely and the implied covenant and fraud claims are not well-pled.

Despite the "critical importance" of customer relationships to Pilot's plans for Manna's assets, it offers no viable excuse for waiting until *after* the 15-month contractual limitations period expired to seek indemnification.[13] To avoid dismissal of its indemnification claims, Pilot conjures an argument that Sellers "put Pilot off the 'trail of inquiry'" by employing an "'actual artifice' to [] prevent Pilot from learning about the true status of [the] customer relationships."[14] But after giving Pilot the benefit of all reasonable inferences flowing from the Complaint, it is not

---

[11] Compl. ¶ 43 (Modus was a "lost customer"), ¶ 55 (Personal Comfort was "no longer a customer at all"), ¶ 72 (Big Fig "no longer intended to be a customer").

[12] Compl. ¶ 34.

[13] Compl. ¶ 2.

[14] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Compl. ("PAB") (D.I. 23) at 22.

reasonably conceivable that the Sellers did *anything* to prevent Pilot from discovering within the contractual limitations period that the three "critical" customers it has identified were, in Pilot's words, "no longer [] customer[s] at all."[15]

The APA was a "heavily negotiated" contract that "cover[ed] a large number of specific risks explicitly."[16] One of those risks was that Manna's top customers would go elsewhere. The APA's bargained-for "representations and warranties serve an important risk allocation function" by allowing Pilot to fine-tune its risk preferences regarding these top customers.[17] Given that Pilot knowingly bargained away the right to seek indemnification for breaches of the relevant representations and warranties after 15 months from closing, Pilot may not avail itself of a remedy that, by its own hand, no longer exists. Accordingly, Pilot's indemnification claims must be dismissed.

The implied covenant claim parrots the allegations supporting the claim for indemnification. This is not surprising given that the gravamen of the claim is that Sellers acted in bad faith by falsely representing in the APA the state of Manna's

---

[15] Compl. ¶ 55.

[16] *In re Tibco Software Inc. S'holders Litig.*, 2014 WL 6674444, at *18 (Del. Ch. Nov. 25, 2014).

[17] *Id.*; *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *15 (Del. Ch. Oct. 31, 2019).

4

relationship with key customers. This topic is covered expressly in the APA; there is no room for the implied covenant. That claim must also be dismissed.

Apart from a minor dispute involving Manna's accounts receivable,[18] this leaves Pilot with fraud claims. In this regard, Pilot alleges Sellers "fraudulently induce[d] Pilot to proceed to Closing" (later defined) by making certain false statements regarding a number of customers within the Agreement.[19] After carefully reviewing the Complaint and the APA, I am satisfied the bulk of the alleged fraud is pled with particularity, not barred by the APA's non-reliance clause and not otherwise barred as bootstrapped breach of contract claims. The motion to dismiss the contractual fraud claims, therefore, must be denied.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Complaint and documents incorporated by reference or integral to that pleading.[20] For purposes

---

[18] As explained below, the Complaint does well-plead a breach of contract claim with respect to certain Excluded Liabilities.

[19] Compl. ¶ 4.

[20] Compl.; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a Motion to Dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

of Defendants' Rule 12(b)(6) motion, as I must, I accept those well-pled facts as true.[21]

## A. The Parties and Relevant Non-Parties

Pilot is a "worldwide provider of transportation and logistics services."[22] Until Pilot acquired substantially all its assets, Manna was also engaged in the trucking and logistics industry.[23] The Trust is Manna's sole shareholder.[24]

Meehan is an individual who resides in Minnesota.[25] He is alleged to be Manna's founder and the sole settlor and grantor of the Trust.[26] Meehan was Manna's CEO at all relevant times before the closing.[27]

Non-Parties, Modus Furniture International ("Modus"), Personal Comfort Beds ("Personal Comfort"), Big Fig Mattress ("Big Fig") and General Electric

---

[21] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[22] Compl. ¶¶ 1, 7.

[23] Compl. ¶¶ 1, 8.

[24] Compl. ¶ 9.

[25] Compl. ¶ 10.

[26] *Id.*

[27] *Id.*

6

("GE") were Manna customers.[28]  Non-party, Forward Air Corp. ("Forward Air"), was a Manna supplier.[29]

### B. Pilot and Manna's Strategic Overlap

Prior to the Acquisition, Manna's business focused on providing "final mile" delivery services, specializing in more difficult deliveries "(*i.e.*, mattress delivery)."[30]  This business relied heavily on revenue generated from repeat customers.[31] Pilot saw the Acquisition as a means to expand its global transportation and logistics business by adding "final mile" delivery service to its existing logistics offerings.[32]  By adding this piece of the delivery puzzle, Pilot would be positioned to "provide customers with a complete package of delivery solutions" and could then offer its "full mile" services to Manna's "last mile customers."[33]

---

[28] Compl. ¶¶ 36, 55, 68, 77, 84.

[29] Compl. ¶ 78.

[30] Compl. ¶ 1. "Final (or last) mile" deliveries take product from intermediate depos to the final destination.

[31] *Id.*

[32] Compl. ¶¶ 1, 2, 27.

[33] Compl. ¶ 31. "Full mile" deliveries take product from origination to final destination.

## C. The APA

Pilot, Manna, the Trust and Meehan signed the APA on June 26, 2018 (the "Signing").[34] The Acquisition of substantially all of Manna's assets closed three weeks later, on July 16, 2018 (the "Closing" or "Closing Date").[35]

Not surprisingly, the APA contains a series of interrelated provisions whereby Sellers (i) disclaimed all extra-contractual representations and warranties, (ii) explicitly provided Pilot with a discrete list of contractual representations and warranties about the Company, (iii) represented that the contractual representations and warranties were true as of the Signing and the Closing, (iv) set aside a portion of the purchase price in escrow to serve as Pilot's exclusive source of recovery should Pilot prove that the representations and warranties were untrue as of the date they were made, (v) agreed to indemnify Pilot out of the escrow fund for any losses arising out of a breach of the contractual representations and warranties and (vi) contractually specified the date by which any claims for breaches of Sellers' representations and warranties must be brought.[36]

---

[34] APA (recitals); Compl. ¶ 1. The APA includes a Delaware choice-of-law provision and provides that the exclusive jurisdiction and venue for APA disputes shall be the state and federal courts of the State of Delaware. APA § 14.7; Compl. ¶ 13.

[35] APA § 1.1 ("Purchased Assets"); Compl. ¶¶ 17–18. The purchase price was $18,000,000 subject to certain net working capital and tax adjustments. APA § 2.1 ("Purchase Price").

[36] APA § 9.8 ("Limitation of Representations and Warranties"), § 5 ("Representations and Warranties By Seller"), § 5 (Sellers' Representations and Warranties made as of the Signing), § 8.2 (Sellers' representations and warranties true as of the Closing), § 9.1

8

## 1. The Non-Reliance Provision

The APA contains a non-reliance provision whereby Pilot agreed that it was not relying on any extra-contractual representations or warranties when it entered into the APA.[37] Specifically, in Section 9.8 of the APA, captioned "Limitation of Representations and Warranties," Pilot agreed:

> Except for the representations and warranties expressly set forth in Article 5, the Seller and the Owners are not making and shall not be deemed to have made, any other representations or warranties, written or oral, statutory, express or implied, concerning the Seller, the Owners, the Purchased Assets, the Assumed Liabilities, the Business or any other matter related to this Agreement, all of which are otherwise being accepted by Purchaser "AS IS AND WHERE IS." . . . EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE 5, NEITHER THE SELLER NOR THE OWNERS HAS MADE, AND THE SELLER AND THE OWNERS HEREBY EXPRESSLY DISCLAIM AND NEGATE, AND PURCHASER HEREBY EXPRESSLY WAIVES AND AGREES THAT IT IS NOT RELYING ON, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND PURCHASER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST THE SELLER, THE OWNERS AND THEIR REPRESENTATIVES IN CONNECTION WITH, THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY STATEMENTS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) OR DOCUMENTS HERETOFORE FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS

---

("Indemnification by Seller"), § 9.4(b) (Sellers' liability "shall not exceed" the "Escrow Amount" subject to narrow exceptions), § 9.6 (discussing the "Escrow"), § 9.5 (discussing "Survival").

[37] APA § 1.1; Compl. ¶ 17.

REPRESENTATIVES BY OR ON BEHALF OF THE SELLER OR THE OWNERS.[38]

Relatedly, in Section 14.4, the parties agreed the APA, "together with all disclosure schedules, . . . constitutes the entire agreement between the parties."[39] To remove all doubt, the APA reiterates that it was to "supersede any prior understandings, agreements, or representations and warranties by or among the parties."[40] When read together, Article 9 and Section 14.4 make clear that Pilot had no right to rely on Sellers' extra-contractual statements concerning Manna and its business.[41]

The APA distinguishes between Sellers' extra-contractual representations and warranties (on which Pilot agreed it would not rely) and the contractual representations and warranties for which Pilot bargained in the APA. In Section 9.1, the APA states:

> Nothing in this Agreement shall limit or restrict any of Purchaser's rights to maintain or recover *any amounts at any time* in connection with any action or claim based upon *intentional fraud* by Seller or Owner *in this Agreement*.[42]

---

[38] APA § 9.8 (capitalization in original).

[39] APA § 14.4 ("Entire Agreement").

[40] *Id.*

[41] APA §§ 9.1, 9.8, 14.4.

[42] APA § 9.1 (emphasis supplied).

10

Accordingly, the APA preserves Pilot's right to bring a claim for "intentional fraud" at "any time," provided the basis for the alleged fraud arises out of Sellers' representations and warranties in the APA.

## 2. Sellers' Representations and Warranties

As the relevant provisions make clear, the risk allocation scheme manifested in the APA placed singular focus on the promises the parties made to each other in the contract itself. Relevant here, Sellers represented and warranted to Pilot that, as of the Signing, and then as of Closing:[43]

- **Section 5.6 (Financial Statements)**: except as set forth in the disclosure schedules, the Company's financial statements for the year ended 2016 and 2017, as well as the interim period ended April 30, 2018 (the "Interim Financial Statements") "present fairly, in all material respects, the financial position of Seller at such dates and the results of operations of Seller for such respective periods in conformity with . . . [GAAP]."[44]

---

[43] APA Art. V ("Each of Seller, the Trust and Meehan jointly and severally represent and warrant to Purchaser, as of the [Signing], as follows:"); § 8.2(a) ("The representations and warranties of Seller and Owner contained in Article 5 shall be true and correct in all respects (without giving effect to any update of the Disclosure Schedules pursuant to Section 10.7) on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except for any inaccuracy in any representation and warranty that, individually or in the aggregate with any other such inaccuracy, has not had a Material Adverse Effect."); § 8.2(i) (discussing officer certificates). Critically, while Sellers made these representations at Signing and then again at Closing, to the extent a specific statement "addresses matters only as of a specified date, the accuracy" of such statement "shall be determined as of that specified date *in all respects*." § 8.2(a) (emphasis supplied).

[44] APA § 5.6.

- **Section 5.8 (Absence of Changes)**: Except as set forth on the Company's disclosure schedules, since April 30, 2018 to Closing, there has not been: (a) any Material Adverse Effect, (b) any "damage, destruction or loss" adversely affecting the "properties or assets of the Business in any material respect" or (c) any "transactions with respect to the Business not in the ordinary course."[45]
- **Section 5.24 (Accounts Receivable)**: except as set forth in disclosure schedules, all of the accounts receivable reflected on the Company's financial statements "will be actual and bona fide receivables" that are stated "in accordance with GAAP." And, to the Knowledge[46] of the Seller, there are not any amounts in excess of $10,000 due in respect of any such individual account receivable that is in dispute.[47]
- **Section 5.27 (the "Customer Rep")**: "Set forth on Schedule 5.27 hereof is a true and complete list of Seller's 30 largest customers for calendar year 2017 (by revenue attributable to such customers) ("Material Customers") . . . Except as indicated on Schedule 5.27, . . . neither Seller nor Owner has received written notice or, to the Knowledge of Seller, any oral notice from any Material Customer that any Material Customer intends or expects, after the Closing Date, to stop or materially decrease the volume of, or change, adjust or modify in any materially adverse manner any of the material terms . . . with respect to its purchasing of services from Seller."[48]
- **Section 5.28 (Vendors)**: the Company's disclosure schedules contain "a true and complete list" of the Company's "30 largest vendors for calendar year 2017. . . . Since January 1, 2016, neither Seller nor Owner has received written notice, or to the Knowledge of Seller, any oral notice" that any such vendor "intends or expects to stop or materially

---

[45] APA § 5.8; *see also* APA § 5.6 (discussing the "Interim Balance Sheet"), § 8 (discussing closing conditions).

[46] The APA defines "Knowledge" to mean the actual knowledge of Meehan or the Company's COO or CFO. APA § 9.1(p).

[47] APA § 5.24.

[48] APA § 5.27.

change . . . any of the material terms . . . with respect to its provision of goods or services" to the Company.[49]

Two aspects of the Customer Rep are particularly important to Pilot's breach and fraud claims. *First*, Sellers disclosed a list of the Company's 30 largest customers "for calendar year 2017."[50] On its face, the Customer Rep says nothing about Manna's largest customer during any other time period. This leaves a six-month gap between the period addressed in the Customer Rep (i.e., the end of 2017) and the Signing (June 26, 2018).[51] *Second*, Sellers represented that no Material Customer from the list had notified the Company of an intent to "stop or materially decrease" their purchases "*after the Closing Date*" (a "Business Reduction Notification").[52]

Another key aspect of Sellers' disclosure is the "disclosure statements" carve-out. As noted, Sellers' representations and warranties are qualified by the phrase "except as set forth" on the Company's disclosure statements.[53] Accordingly, if

---

[49] APA § 5.28.

[50] APA § 5.27.

[51] *Compare* APA § 5.27 (disclosing the Company's largest customers "for calendar year 2017), *with* Compl. ¶ 16 (signing occurred on June 26, 2018).

[52] APA § 5.27 (emphasis supplied).

[53] *See, e.g.*, APA § 5.8 ("Except as set forth on Schedule 5.8"), § 5.6 ("Except as set forth on Schedule 5.6").

Sellers disclosed a fact in a disclosure statement, that disclosure, in essence, was carved out of Sellers' representations and warranties.

Sellers provided the first disclosure statement to Pilot at Signing (the "Original Disclosure Schedules"). Under Section 10.7, Sellers then had the option to update (or not) the disclosure schedules before Closing (the "Updated Disclosure Schedules"):[54]

> Seller and the Owners may from time to time before Closing update the Disclosure Schedules regarding any matter about which they obtain Knowledge after the date hereof that would constitute a breach of any of the representations and warranties in this Agreement in the form of a written supplement or amendment delivered to Purchaser; provided, any such update by Seller and the Owners shall be made within seven (7) days of Seller first obtaining such Knowledge. No such supplement or amendment shall have any effect on the satisfaction of the conditions to closing set forth in Section 8.2; provided, however, if Purchaser proceeds with the Closing, then Purchaser and the other Purchaser Indemnified Persons shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including for indemnification pursuant to Article 9, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or before the Closing, and the representations and warranties shall be qualified by any matters set forth in such supplement or amendment.[55]

As the APA makes clear, the information contained on the Updated Disclosure Schedules would not affect (one way or the other) Pilot's obligation to close, but if

---

[54] APA § 10.7 ("Updating Disclosure Schedules"); Compl. ¶ 22.

[55] APA § 10.7.

Pilot "proceeds with the Closing," then Pilot would waive any claim with respect to the matters disclosed.[56]

### 3. Indemnification and Survival

Section 9.1 of the APA defines Pilot's indemnification rights:

> From and after the Closing and subject to the limits set forth in this Article 9, Seller and each Owner, jointly and severally, shall indemnify, defend and hold Purchaser . . . harmless from and against any and all loss, liability, damage, or expense . . . (collectively "Losses") that [Purchaser may] suffer, sustain, incur or become subject to, arising out of, resulting from or due to: (a) any breach or inaccuracy when made of any representation and warranty of Seller or Owner in this Agreement; (b) the non-fulfillment of any covenant, agreement or other obligation of Seller or Owner under this Agreement; (c) any Excluded Liabilities; . . . (g) IC Liabilities incurred by Seller to the extent arising out of Seller's operations prior to the Closing Date, up to the remaining Escrow Amount then held in escrow under the Escrow Agreement. [57]

While broad, the right to indemnification under the APA, in most instances, is not indefinite. In a section of the APA entitled "Survival," Pilot agreed that most of the Sellers' representations and warranties, including the key ones at issue here, would survive for only 15 months after Closing:

> <u>All representations and warranties set forth in this Agreement shall survive for a period of 15 months after the Closing</u>; provided, however, that the Fundamental Representations and the representations and warranties made by Purchaser in Sections 6.1 (Corporate Organization and Standing), 6.2 (Authority), and 6.3 (Brokers) shall survive until the

---

[56] APA § 8.2(i), § 8.2(a) (stating that Pilot was not obligated to close unless "[t]he representations and warranties of Seller and Owner contained in Article 5 shall be true . . . as of the Closing Date").

[57] APA § 9.1.

expiration of the statute of limitations plus sixty (60) days. All covenants, indemnities and agreements of [Manna] and the Owners shall survive for three (3) years after the Closing Date (after which such obligations shall terminate), except (i) each of Section 10.2 and Section 10.3 shall survive in accordance with its terms, and (ii) the indemnification obligations of Seller and Owners with respect to Fundamental Representations shall continue in accordance with the terms of this Section 9.3. . . . No claim for indemnification as to representations and warranties under this Agreement may be made after the expiration of the applicable period set forth in this Section 9.3 and [Manna] and the Owners shall have no Liability for any claims made after the expiration of such applicable period for breach of or an inaccuracy when made of a representation or warranty. All demands or claims for indemnification under this Agreement shall be in writing and shall set forth with reasonable specificity the basis for such demand or claim and the amount of such claim (if known).[58]

The practical impact of the Survival clause is that claims for breach of representations and warranties subject to the clause must be brought within 15 months of Closing. Thereafter, the claims are time barred.

On the same day as the Closing, the parties entered into an escrow agreement, which required that $1,500,000 be placed into escrow to cover timely claims brought by the buyer (Pilot) for indemnification (the "Escrow Property").[59] If no claims for indemnification were presented within 15 months after Closing, any amount remaining in the escrow was to be distributed to Sellers.[60]

---

[58] APA § 9.3 (emphasis supplied).

[59] Compl. ¶ 19.

[60] Compl. ¶ 20.

16

## D. Business Reduction Notifications

"In 2017 and 2018, Manna's business relationships with certain key customers fell into jeopardy."[61] Indeed, several customers "advised Manna that they intended to terminate their relationship with Manna."[62] According to Pilot, when Manna learned that several of the Company's key clients would be leaving the fold, its management (including Meehan) "initiated a scheme to misrepresent to Pilot the declining or essentially ended nature of [these] material customer relationships."[63] Pilot flags three troubled customer relationships that it believes Manna had a duty to disclose under the APA.

### 1. Modus

In the Original Disclosure Schedules, Sellers identified Modus as Manna's fourth largest customer by revenue "for calendar year 2017."[64] Specifically, the Sellers represented Modus' billed revenue for 2017 was $2,317,000.[65] Pursuant to Sellers' contractual obligation to disclose Business Reduction Notifications, the Original Disclosure Statement revealed that "[i]n 2018 and in the ordinary course of

---

[61] Compl. ¶ 3.

[62] *Id*.

[63] Compl. ¶ 34.

[64] Compl. ¶ 36; APA § 5.27.

[65] Compl. ¶ 36.

business, Modus . . . decreased the volume of services purchased from [Manna]."[66] The Original Disclosure Statement did not reveal, however, that six months before Signing, Modus notified Manna that it intended to terminate its business with the Company.[67] Upon receiving this notice, Manna's management began to identify Modus as a "lost customer."[68]

## 2. Personal Comfort

The Sellers' Original Disclosure Schedule listed Personal Comfort as the Company's twenty-fifth largest customer during 2017 with aggregated billed revenue of $446,000.[69] Despite this significant business during 2017, by Signing, Personal Comfort was no longer a Manna customer.[70] Indeed, Sellers knew at least a month before Signing that Personal Comfort was no longer transacting business with the Company due to customer service issues.[71]

By the time Sellers received Personal Comfort's Business Reduction Notification before Signing, the Original Disclosure Schedules had been issued and

---

[66] Compl. ¶ 49.

[67] Compl. ¶¶ 37, 38.

[68] Compl. ¶ 39.

[69] Comp. ¶ 55.

[70] *Id.*

[71] Compl. ¶ 63.

made no mention of Personal Comfort's cessation of business.[72]  It was not until well after receiving Personal Comfort's Business Reduction Notification that Sellers finally disclosed the bad news regarding the loss of Personal Comfort's business on the Updated Disclosure Schedule.[73]

### 3. Big Fig

On the Original Disclosure Schedule, Sellers listed Big Fig as the Company's twenty-fourth largest customer in 2017 with revenue of $452,000.[74]  Pilot alleges Sellers were aware, as of April 20, 2018, that Big Fig was "dissatisf[ied]" with Manna's services.[75]  And, on information and belief, Pilot alleges "Big Fig advised Sellers prior to Closing that it no longer intended to be a customer of Manna's."[76] Neither the Original nor the Updated Disclosure Schedule contained any mention of Big Fig's Business Reduction Notification.[77]

---

[72] Compl. ¶¶ 63–64.

[73] Compl. ¶¶ 63, 64, 67.

[74] Compl. ¶ 68.

[75] Compl. ¶¶ 70–72.

[76] Compl. ¶ 72.

[77] *Id.*

Separately, Pilot maintains Sellers never disclosed that a $127,144 receivable from Big Fig was "uncollectible and in dispute."[78]  Even though Sellers disclosed a $50,000 reserve against this receivable, Pilot claims Sellers "had actual knowledge that the full amount of the receivable was uncollectible."[79]

*****

The chart below summarizes the Business Reduction Notifications Pilot alleges Sellers received and yet failed to disclose in order to induce Pilot to sign the APA and close the Acquisition:[80]

*Remainder of Page Intentionally Left Blank*

---

[78] Compl. ¶ 75.

[79] *Id.*

[80] Compl. ¶¶ 16, 18.  As noted, the APA was signed on June 26, 2018, and the Acquisition closed on July 16, 2018.

| | Alleged date Sellers received Business Reduction Notification from a customer | Method and date of Sellers' disclosure of Business Reduction Notification | Content of disclosure |
|---|---|---|---|
| **Modus** | December 29, 2017 [1] | Footnote to Original Disclosure Schedule, dated June 26, 2018 [2] | "In 2018 and in the ordinary course of business, Modus . . . [has] decreased the volume of services purchased from Seller." [3] |
| **Personal Comfort** | May 24, 2018 or June 27, 2018 at the latest [4] | Updated Disclosure Schedules, dated July 16, 2018 (more than 7 days after Sellers received Business Reduction Notification) [5] | "In 2018 and in the ordinary course of business, Personal Comfort [] no longer purchases services from Seller." [6] |
| **Big Fig** | On April 20, 2018, the Sellers knew Big Fig had made complaints. [7] "Upon information and belief, Big Fig advised Sellers prior to Closing that it no longer intended to be a customer." [8] | No disclosure [9] | No disclosure |
| [1] Compl. ¶ 37; [2] Compl. ¶ 49; [3] Compl. ¶ 49; [4] Compl. ¶¶ 59, 63; [5] Compl. ¶ 64; [6] Compl. ¶ 64; [7] Compl. ¶ 70; [8] Compl. ¶ 72; [9] Compl. ¶ 72. | | |

## E. Vendor Rates and Customer Service Setoff Disputes

In addition to negative customer relationship developments pre-Signing and pre-Closing, Manna experienced negative pre-Closing developments related to its vendors and shipping liabilities. According to Pilot, neither of these issues were adequately disclosed in either the Original or the Updated Disclosure Schedules.[81]

*First*, in the Original Disclosure Schedule, Sellers disclosed that Forward Air was Manna's third largest vendor.[82] Sellers also disclosed that "in 2018 and in the

---

[81] Compl. ¶¶ 77–82, 83–86.

[82] Compl. ¶ 79.

ordinary course of business, Forward Air [] has increased its prices."[83]  Sellers

included this disclosure because "Forward Air gave [notice of] a rate increase of

5.9%" that would "go effective" on "9-1.18" (two months after Closing).[84]  Pilot

alleges Sellers' actual disclosure (i.e., "in 2018" and in the "ordinary course,"

Forward Air increased its prices) led it to believe that Forward Air's price increase

"had already occurred and was already reflected in" the Company's financial

disclosures.[85]

*Second*, GE was a pre-Closing customer of Manna's.[86]  After the Closing, GE

informed Pilot that it was claiming a set-off of payments owed in the aggregate

amount of $69,440 due to certain "shipment issues."[87]  Originally, GE claimed these

losses occurred post-Closing.[88]  After an investigation, however, GE determined it

---

[83] Compl. ¶ 79.

[84] Compl. ¶ 81.  It is unclear when Pilot alleges the price increase took place.  *Compare* Compl. ¶ 81 ("beginning of June"), *with* Compl. ¶ 81 (stating an increase will "go effective [] 9-1.18").

[85] Compl. ¶ 80.

[86] Compl. ¶ 84.

[87] Compl. ¶¶ 84–85.

[88] Compl. ¶¶ 84–86.

"had made an administrative error, and realized that all of the complained of losses occurred prior to Closing."[89]

## F. Procedural History

Pilot sent Sellers an indemnification demand (the "Demand") on October 14, 2019.[90] The Demand claimed Pilot suffered damages in excess of $6.9 million because of Sellers' alleged wrongdoing in connection with the APA.[91] Sellers disagreed and rejected the Demand. With this dispute unresolved, the Escrow Property cannot be released unless and until the parties issue written joint instructions for release of the funds to the escrow agent or a court of competent jurisdiction enters a final, non-appealable judgment resolving the claims.[92]

After negotiations proved unsuccessful, Pilot filed the Complaint in this Court on December 11, 2019 (more than 15 months post-Closing).[93] The Complaint comprises six counts. In Counts I and II, Pilot claims Sellers breached the APA,

---

[89] Compl. ¶ 86.

[90] Compl. ¶ 88.

[91] *Id.*

[92] Compl. ¶ 89.

[93] Compl. ¶ 1.

giving Pilot a right to indemnification and release of the Escrow Property.[94] Pilot's breach of contract claims fall into four buckets.

*First*, Pilot alleges it received inadequate disclosure of the Business Reduction Notifications from Modus, Personal Comfort and Big Fig before the Closing.[95] With respect to Modus, Pilot concedes the Original Disclosure Schedules revealed that, "[i]n 2018 and in the ordinary course of business," Modus "decreased the volume of services purchased from Seller."[96] But Pilot alleges this disclosure was false and intentionally misleading because Modus' 90% purchasing reduction was not "ordinary course."[97] As for Personal Comfort, Pilot concedes Sellers disclosed that "in 2018 and in the ordinary course of business, Personal Comfort Beds no longer purchases services from Seller."[98] Despite this disclosure, Pilot argues it came too late because it (a) should have been included on the Original Disclosure Statement and (b) was added to the Updated Disclosure Schedules more than 7 days after Sellers received notice from Personal Comfort.[99] Finally, as for Big Fig, Pilot

---

[94] Compl. ¶¶ 91–110.

[95] Compl. ¶¶ 37, 55, 71–72.

[96] Compl. ¶ 49.

[97] *Id.*

[98] Compl. ¶¶ 64, 67.

[99] Compl. ¶ 67; *see* APA § 10.7 (stating that, to be effective, any updated disclosure must be made "within seven (7) days of [Manna] first obtaining such Knowledge").

contends Sellers did not make *any* disclosure of Big Fig's Business Reduction Notification even though it was received pre-Closing.[100]

Taken together, Pilot argues these factual allegations state viable claims for breach of the Customer Rep (requiring disclosure of Business Reduction Notifications)—as well as the representations in Section 5.6 (accuracy of financial statements) and Section 5.8 (absence of material adverse effect).[101] On the latter claim, it appears Pilot would have the Court conclude that these three customers' departure had such a severe impact on the Company as a whole that it caused a "Material Adverse Effect."[102] Pilot levels this claim even though the total loss of Modus, Personal Comfort and Big Fig would have accounted for no more than 6% of the Company's total revenue *even if* the Company added no new customers during 2018.[103]

Pilot's theory as to Section 5.6 is even less clear. Pilot does not allege the Company's financial statements were inaccurate (i.e., that the Company made more

---

[100] Compl. ¶¶ 71–72.

[101] Compl. ¶¶ 51–52, 66–67, 73.

[102] Compl. ¶¶ 50, 65.

[103] *See* Compl. ¶ 36 ($2,317,000 revenue attributed to Modus during 2017), ¶ 47 (Modus' 2017 revenue was 4% of total revenue), ¶ 55 ($446,000 revenue attributed to Personal Comfort during 2017), ¶ 68 ($452,000 revenue attributed to Big Fig during 2017). The product of $2,317,000 and 100 divided by 4 renders the Company's total revenue during 2017 (*i.e.*, $57,925,000).

or less money than Sellers reported). Rather, Pilot appears to argue that because Manna failed to disclose the Business Reduction Notifications, the Company's financial statements no longer "present fairly . . . the financial position of [Manna]" on a *prospective* basis.[104] And yet, to be clear, Pilot does not allege Sellers provided it with any financial forecasts—only backwards-looking financial statements.

*Second*, and unrelated to the Business Reduction Notification claims, Pilot alleges Sellers breached the representation in Section 5.24 of the APA because the Big Fig receivable of $127,114 on the Company's disclosure statements was not a "bona fide" receivable.[105] The Complaint alleges Sellers had "actual knowledge that the full amount of the receivable was uncollectible."[106]

*Third*, Pilot brings a claim predicated on the verb tense of Sellers' disclosure related to Forward Air's price increase. Specifically, Pilot argues that when it was told Forward Air "***has increased*** its prices," it was misled to believe that "the price increase . . . was already reflected" in the Company's financial statements

---

[104] Compl. ¶ 51; PAB at 29–31.

[105] Compl. ¶¶ 74–76; *see* APA § 5.24 (Sellers' representation that "[a]ll of the accounts receivable reflected on the Interim Balance Sheet are . . . actual and bona fide receivables . . . . Such accounts receivable . . . are stated [] in accordance with GAAP . . . . Except as set forth on [the Original Disclosure Schedule], to the Knowledge of [Manna], there are not (i) any amounts in excess of $10,000 due . . . that is in dispute").

[106] Compl. ¶¶ 74–76.

(it was not).[107] This, by Pilot's lights, constitutes a breach of Sellers' representation in Section 5.28 (captioned "Vendors").[108]

*Fourth*, Pilot makes breach claims unrelated to Sellers' representations and warranties. Specifically, it alleges Sellers breached Sections 10.7 and 3.2 of the APA by failing to update the Original Disclosure Schedules within 7 days of becoming aware of any matter that would constitute a breach of their representations and warranties (Section 10.7) and failing to accept responsibility for GE's offset claim of $69,440 as an "Excluded Liability" (Section 3.2).[109]

In Counts III–VI, Pilot repurposes the factual predicates of its breach of contract claims to plead breach of the implied covenant of good faith and fair dealing, fraud, fraudulent inducement and negligent misrepresentation, respectively.[110]

---

[107] Compl. ¶¶ 79–80 (emphasis in original).

[108] Compl. ¶¶ 77–82; *see* APA § 5.28 ("Set forth on [the Original Disclosure Schedules] is a true and complete list of [Manna's] 30 largest vendors . . . . Since January 1, 2016, neither [Manna] nor Owner has received written notice . . . that any Material Vendor intends or expects to . . . materially change . . . any of the material terms . . . with respect to its provision of goods.").

[109] Compl. ¶¶ 23, 83–86; PAB at 9, 20.

[110] Compl. ¶¶ 111–165.

In response, Sellers have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to plead viable claims and Rule 9(b) for failure to plead fraud with particularity.[111]

## II. ANALYSIS

The standards for deciding a motion to dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[112]

### A. Breach of Contract Claims (Counts I–II)

To prevail on a breach of contract claim, Pilot must plead and prove "(1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach."[113]  Of these elements, only the second is in dispute.[114]

---

[111] D.I. 12; Ct. Ch. R. 12(b)(6); Ct. Ch. R. 9(b).

[112] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation omitted).

[113] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013).

[114] *See* Defs.' Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified Compl. ("DOB") (D.I. 14) at 29.

28

Breach of contract claims are susceptible to disposition on a motion to dismiss "[w]hen the language of [the] contract is plain and unambiguous."[115] Contract language is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[116] If the plaintiff has proffered a reasonable construction upon which its claim of breach rests, the motion to dismiss must be denied.[117]

### 1. Pilot's Indemnification Claims

The main thrust of Pilot's breach of contract claim is that certain Seller representations and warranties were untrue (both at Signing and again at Closing) and that Pilot is thus entitled to indemnification under Section 9.1 of the APA.[118] In particular, many of Pilot's claims turn on the Customer Rep in Section 5.27 and the allegations that while Modus, Personal Comfort and Big Fig were top customers during 2017, by the summer of 2018, Sellers knew those customers would no longer do business with Manna.[119] Pilot maintains these customer departures triggered

---

[115] *Id.*

[116] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (quotations omitted).

[117] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *Kahn v. Portnoy*, 2008 WL 5197164, at *1 (Del. Ch. Dec. 11, 2008).

[118] Compl. ¶ 96 (alleging breaches of Sections 5.6, 5.8, 5.24, 5.27 and 5.28).

[119] Compl. ¶¶ 37–39, 55, 68–69.

Sellers' obligation to disclose their receipt of a Business Reduction Notification under Section 5.27.[120] Even though Sellers *did* disclose that Modus and Personal Comfort had reduced their purchases during 2018, Pilot alleges the disclosure schedules were misleading because they stated Modus and Personal Comfort had decreased purchases "in the ordinary course" of business, and there was no disclosure as to Big Fig.[121]

The default statute of limitations for breach of contract is three years.[122] Delaware law, however, permits parties to shorten the three-year statute of limitations by contract if "(1) the claims are based on a written contract; (2) the contract involved at least $100,000; and (3) the contract specifies a period for claims to accrue."[123] There is no dispute that Pilot's indemnification claims are based on a written contract that involves at least $100,000.[124] The parties dispute the third element—whether the APA sets a contractual limitations period.

---

[120] Compl. ¶¶ 49, 64, 72.

[121] *Id.*

[122] 10 *Del. C.* § 8106(a).

[123] 10 *Del. C.* § 8106(c); *AssuredPartners of Va. v. William Patrick Sheehan*, 2020 WL 2789706, at *15 (Del. Super. Ct. May 29, 2020).

[124] *See* APA § 2.2(c) (discussing the "Estimated Cash Purchase Price").

In Delaware, the default rule is that representations and warranties do *not* survive closing, but parties may agree to create a contractual survival period if they so choose:

> Absent contract language providing to the contrary, pre-closing representations about the acquired property interest become ineffective post-closing under the same rationale that causes representations about real property to merge with a warranty deed. . . . [But] [p]arties can contract for representations to survive closing by incorporating a survival clause in the transaction agreement.[125]

To the extent representations and warranties survive closing, claims that a party's representations were false must be brought within the applicable limitations period, whether contractual or statutory as the case may be.[126]

"There is no special rule requiring that in order to contractually shorten the statute of limitations, parties [must] utilize clear and explicit language."[127] Rather, "Delaware courts have interpreted contractual provisions that limit the survival of representations and warranties as evidencing an intent to shorten the period of time

---

[125] *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at \*14 (Del. Ch. Jan. 12, 2015) (internal quotation and citation omitted).

[126] *See Shaw v. Aetna Life Ins. Co.*, 395 A.2d 384, 386 (Del. Super. Ct. 1978) ("The Delaware decisions follow the general principle that contractual limitation of actions periods are valid if they are reasonable.").

[127] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at \*12 (Del. Ch. July 11, 2011) (internal quotation omitted).

in which a claim for breach of those representations and warranties may be brought, i.e., the statute of limitations."[128]

In the APA, the parties agreed Sellers' representations and warranties (other than fundamental representations and warranties that are not at issue) "shall survive for a period of 15 months after the Closing."[129] Pilot filed the Complaint more than 15 months after the Closing.[130] Given this express limitations period, and the settled law that claims for breaches of representations and warranties accrue at closing, Pilot's claims for breaches of Sellers' representations and warranties are untimely.[131]

Pilot attempts to escape this conclusion by making four arguments, each of which it foreswore in the APA itself. *First*, Pilot reasons that because Manna's indemnity obligations survive for "3 years after the Closing date," that must mean that Pilot can sue Manna for breached representations and warranties any time within

---

[128] *Id.*

[129] APA § 9.3.

[130] *Compare* APA § 9.3 (stating "all" representations and warranties "shall survive for a period of 15 months after the Closing"), *and* Compl. ¶ 18 (The APA closed on July 16, 2018.), *with* D.I. 1 (showing that the Complaint was filed on December 11, 2019).

[131] *GRT*, 2011 WL 2682898, at *6 ("Because representations and warranties about facts pre-existing, or contemporaneous with, a contract's closing are to be true and accurate when made, a breach occurs on the date of the contract's closing and hence the cause of action accrues on that date.").

three years post-Closing.[132]  This is wrong.  In Section 9.3, Pilot expressly acknowledged that:

> *No claim* for indemnification *as to representations and warranties* under this Agreement *may be made after [15 Months]* . . . and Seller and the Owners shall have no Liability for any claims made after the expiration of such applicable period for breach of or an inaccuracy when made of a representation or warranty.[133]

Because I must "interpret contractual provisions in a way that gives effect to every term of the instrument," I must give effect to Section 9.3, which specifically and explicitly subjects breach of representation and warranty claims to a truncated 15-month survival period.[134]  This reading dovetails with the more general 3-year indemnification period because *other indemnification obligations* (such as the obligation to defend against certain third party claims) are not swept into the 15-month survival clause for inaccurate representations and warranties.[135]  Stated differently, Sellers' obligations to indemnify Pilot for damages caused by inaccurate representations and warranties subject to the 15-month limitations period are a

---

[132] PAB at 16.

[133] APA § 9.3 (emphasis supplied).

[134] *Aircraft Serv. Int'l, Inc. v. TBI Overseas Hldgs., Inc.*, 2014 WL 4101660, at *3 (Del. Super. Ct. Aug. 5, 2014); *see also DCV Hldgs., Inc. v. Con Agra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[135] *See* APA § 9.5 (captioned "Notice and Opportunity to Defend").

*subset* of the losses for which Pilot is entitled indemnity.[136]  But, as to this subset, Pilot committed that any claims would be brought within 15 months of Closing.

*Second*, Pilot argues "written notice is plainly sufficient to" toll the 15-month survival period.[137]  As Pilot sees it, because it gave Sellers a written demand notice on October 14, 2019 (within 15 months of Closing), it had until the expiration of the 3-year indemnification period to file its claims.[138]  Pilot points to the following language from Section 9.3 as support for its tolling argument:

> All demands or claims for indemnification under this Agreement shall be in writing and shall set forth with reasonable specificity the basis for such demand or claim and the amount of such claim (if known).[139]

No matter how emphatically Pilot argues "written notice is plainly sufficient," nothing in the APA says that an indemnification *demand* (rather than filing suit) will toll the survival period.[140]  Pilot expressly agreed that "[n]o claim for indemnification" would be filed after 15 months post-Closing; its *post hoc* spin is unreasonable.

---

[136] *See* APA § 9.1 (obligating Sellers to indemnify Pilot for, among other things, "(a) any breach . . . of any representation and warranty of [Manna]," "(b) the non-fulfillment of any covenant," "(c) any Excluded Liabilities," "(d) any Excluded Taxes").

[137] PAB at 18.

[138] Compl. ¶ 88; PAB at 17–18.

[139] PAB at 18 (citing APA § 9.3).

[140] PAB at 18.

This is not a novel proposition. While it is true that "[p]arties may contractually agree that an indemnification notice tolls the limitation period until the underlying claim is resolved," the APA contains no such tolling provision.[141] In Delaware, by default:

> when parties have shortened the statute of limitations by providing that representations and warranties survive only through a specified date, the party claiming breach *must file suit* within the specified time period. Providing notice within the specified time period is not enough.[142]

To be sure, the APA requires that indemnification "demands" be made in writing, but Pilot's argument conflates contractual conditions precedent to asserting an indemnification claim (i.e., written notice) with the contractual 15-month limitations period. There is nothing inconsistent with "a contractual limitations period that requires the parties to preserve rights by filing a lawsuit, but that still provides for extrajudicial dispute resolution procedures."[143]

---

[141] *See, e.g.*, *Aircraft*, 2014 WL 4101660, at *4 (involving the following contractual language: "if written notice of a violation or breach of any specified representation . . . is given to the party charged with such violation or breach during the period provided . . . such representation [or] warranty . . . *shall continue to survive*").

[142] *Friedman Fleischer & Lowe, LLC v. Accentcare, Inc.*, 2016 WL 6967898, at *3 (Del. Ch. Nov. 29, 2016) (citing *ENI Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *9–10 (Del. Ch. Nov. 27, 2013); *GRT*, 2011 WL 2682898, at *9–10) (emphasis supplied).

[143] *ENI*, 2013 WL 6186326, at *10 (stating "[i]t is not a reasonable interpretation of the SPA that KBR can preserve a lawsuit based on an expired representation or warranty merely by providing notice before the applicable Termination Date"); *see also Kilcullen v. Spectro Sci., Inc.*, 2019 WL 3074569, at *6 (Del. Ch. July 15, 2019) ("Because Spectro's claim notice did not toll the statute of limitation, Spectro's Indemnification Counterclaims

*Third*, Pilot argues the APA did not require it to file suit within 15 months because the APA did not expressly state that representations and warranties "**terminated** on the survival expiration date."[144] As noted, Delaware does not require explicit language to set a contractual limitations period.[145] Where, as here, a contract provides "the representations and warranties of the Seller . . . shall survive until" a specified date, such language unambiguously sets a contractual limitations period.[146] And even if this language were not enough to set a limitations period (it is), to reiterate, Section 9.3 states "*no claim*" for inaccurate representations and warranties "may be made after" 15 months of Closing.[147]

*Finally*, Pilot claims the contractual limitations period should be tolled because Sellers "acted to affirmatively conceal the wrong."[148] In this regard, I gather

---

based on the representations provision are dismissed as time-barred."); *GRT*, 2011 WL 2682898, at *15 ("The most persuasive authorities conclude that [a] survival clause with a discrete survival period has the effect of granting the non-representing and warranting party a limited period of time in which to *file* a post-closing *lawsuit*.") (emphasis supplied).

[144] PAB at 16 (emphasis in original).

[145] *GRT*, 2011 WL 2682898, at *12.

[146] *See Aircraft*, 2014 WL 4101660, at *3 (holding the following language set a contractual limitations period: "the representations and warranties of the Seller contained in Section 2.15 hereof shall survive until the second anniversary of the Closing Date").

[147] APA § 9.3.

[148] PAB at 21 (citing *Lincoln v. Snyder*, 722 F. Supp. 546, 563 (D. Del. 2010)).

Pilot seeks to invoke the doctrine of fraudulent concealment.[149] "Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[150] While not stated clearly in its briefs, Pilot's theory seems to be that the top Customer Rep "put Pilot off the 'trail of inquiry,'" meaning that Pilot relied on the top Customer Rep and did not notice the departure of key customers until it was too late.[151]

The fraudulent concealment doctrine cannot resuscitate Pilot's indemnification claims because "relief" from the limitations period "extends only until the plaintiff is put on inquiry notice."[152] "No theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[153] Importantly, "inquiry notice does not require actual discovery of the reason for injury," but instead "exists when plaintiff becomes

---

[149] PAB at 21 (citing *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *8 (Del. Ch. Jan. 24, 2005)).

[150] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[151] PAB at 22.

[152] *Tyson Foods*, 919 A.2d at 585.

[153] *Id.*

aware of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of injury."[154]

Pilot has pled that when it took over Manna's business, the Company's "fourth" largest customer (accounting for $2,317,000 in revenue) had reduced its purchases by "90%," and the Company's "twenty-fifth" largest customer "was no longer a customer at all."[155] Pilot alleges these departures were so significant that they caused a Material Adverse Effect (as defined in the APA) on the Company before Closing.[156] This means that Pilot believes the Company had experienced such a "significant deterioration" in its business that the "fundamentals of the deal" were threatened.[157] In other words, by the time Pilot took the helm at the Company, ship's alarms had been ringing for months. Against this backdrop, even after affording it all reasonable inferences, Pilot cannot make a reasonably conceivable case for fraudulent concealment given that it was indisputably on inquiry notice of the alleged breach well within the limitations period.[158]

---

[154] *Certainteed*, 2005 WL 217032, at *7 (internal quotation omitted).

[155] Compl. ¶¶ 48, 54–55.

[156] Compl. ¶ 101; PAB at 32.

[157] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *47 (Del. Ch. Oct 1, 2018) (construing a contractual "MAE Condition").

[158] *See, e.g.*, Compl. ¶ 55 ("Personal Comfort was no longer a customer at all" by "June 26, 2018"). Pilot's citation to Vice Chancellor Glasscock's decision in *MKE Holdings v. Schwartz* is misplaced. PAB at 22 (citing *MKE Hldgs. LTD., v. Schwartz*, 2020

The Survival clause represents bargained-for "risk allocation."[159]  If Pilot wanted a longer period within which to ascertain whether Sellers' representations and warranties were accurate, it could have shifted that risk to the Sellers by negotiating a longer survival period.  Now that Pilot memorialized the terms of its agreement with Sellers in the form of a clear and unambiguous contract, the Court cannot allow Pilot to re-trade rights it knowingly bargained away.[160]  For this reason, Pilot's claims for breaches of Sections 5.6, 5.8, 5.24, 5.27 and 5.28 must be dismissed.[161]

---

WL 467937, at *11 (Del. Ch. Jan. 29, 2020)).  There, defendants solicited a $7 million investment by touting a company's financial performance while taking affirmative steps to shield specific, negative accounting reports from plaintiffs' due diligence review.  The plaintiffs received the relevant accounting memoranda only after they made a books and records demand.  *Id.* at *11–12.  Here, on the other hand, Pilot has not pled that Sellers stashed away unflattering documents in a forgotten filing cabinet.  Rather, key customers that had been a focus of Pilot's due diligence review stopped sending *any* business to Manna before the APA closed.  Under any reasonably conceivable set of circumstances susceptible of proof, if Pilot had exercised "reasonable diligence," it would have discovered its injury from these lost customers immediately after the Closing.  *Certainteed*, 2005 WL 217032, at *7.

[159] *In re Tibco*, 2014 WL 6674444, at *18.

[160] *GMG Capital Inv., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

[161] *See* Compl. ¶¶ 96(a), 101.

## 2. Pilot's Remaining Breach of Contract Claims

Having determined that Pilot's claims for breach of Sellers' representations and warranties are untimely, I turn to Pilot's remaining breach of contract claims. Pilot maintains that even if its claims under Article 5 (Sellers' representations and warranties) are untimely, it has stated a viable claim under two provisions of the APA that are not subject to the 15-month survival period. I agree, at least as to one of the remaining breach claims.

Even though not separately pled in the Complaint, Pilot has argued in its Answering Brief that it stated a separate claim for breach of Section 10.7.[162] Pilot's newfound claim appears to rest on its interpretation of the APA that Sellers "were *required to update*" the Original Disclosure Schedules if they received a Business Reduction Notification.[163] That is not what Section 10.7 says. To the contrary, it states, in relevant part:

> [Manna] and the Owners **_may_** from time to time before Closing update the Disclosure Schedules regarding any matter about which they obtain Knowledge . . . that would constitute a breach of any of the representations and warranties in this Agreement . . . provided, any such update . . . shall be made within seven [] days of [Manna] first obtaining such Knowledge. No such supplement or amendment shall have any effect on the satisfaction of the conditions to closing . . . provided, however, if [Pilot] proceeds with the Closing, then [Pilot] . . . shall be

---

[162] *Compare* PAB at 20 (arguing Pilot breached Section 10.7), *with* Compl. ¶¶ 96, 101 (alleging breaches of Sections 3.2, 5.6, 5.8, 5.24, 5.27, 5.28 and 9.1 of the APA).

[163] *See* Compl. ¶ 23 (citing APA § 10.7).

deemed to have waived any right or claim pursuant to the terms of this Agreement . . . with respect to any and all matters disclosed.[164]

On its face, Section 10.7 is *permissive* not *mandatory*.[165]  It does not create new obligations.  Indeed, to the extent Sellers provide updated disclosures, the supplemental disclosure has no impact on whether (or not) their representations and warranties were accurate when made.[166]  It is true that if updated disclosures were given more than seven days after Manna obtained the relevant Knowledge, then Sellers could not rely on the Updated Disclosure Schedules to argue that Pilot had waived its right to seek indemnification by proceeding to Closing.  But that is a separate question from whether Section 10.7 creates an obligation.  On its face, it does not.

Pilot next alleges it is entitled to indemnification for certain "Excluded Liabilities" under Sections 3.2 and 9.1(c) of the APA related to Manna's customer,

---

[164] APA § 10.7 (emphasis supplied).

[165] *See Miller v. Spicer*, 602 A.2d 65, 67 (Del. 1991) ("The use of the verb 'shall' . . . generally connotes a mandatory requirement while the verb 'may' is deemed permissive.") (citation omitted).

[166] APA § 10.7.

GE.[167]  Since this allegation does not involve an inaccurate representation or warranty subject to the 15-month survival period, it is not time barred.[168]

According to Pilot, after Closing, "GE [] determined that it had made an administrative error," and asserted that it had suffered a loss of $69,440 due to a "shipment issue[]" that Manna caused "prior to Closing."[169]  After it discovered the "shipment issue," GE "set-off and reduced its payments to Pilot."[170]  Tracing this factual allegation through the APA, Pilot argues this pre-Closing "shipment issue" was an "Excluded Liability" for which it is entitled to indemnification under Section 9.1(c).[171]

The APA defines "Excluded Liabilities" as, among other things, "[a]ny liabilities or obligations with respect to [Manna's shipping business] arising prior to the Closing Date"; but, "for the avoidance of doubt," Excluded Liabilities do *not* include any "Assumed Liabilities"—even if they arose prior to Closing.[172]  In turn,

[167] Compl. ¶ 83.

[168] *See* APA § 3.2 (stating Pilot "shall not assume or in any way become liable for . . . Excluded Liabilities"); § 9.1 (requiring Sellers to indemnify Pilot for "Excluded Liabilities").

[169] Compl. ¶ 86.

[170] Compl. ¶ 85.

[171] *See* APA § 9.1(c).

[172] APA § 3.2(a).

"Assumed Liabilities" include "all Services Liabilities to the extent of the reserves, accruals, and allowances in the Final Net Working Capital."[173] Finally, the APA defines "Services Liabilities" as "all liabilities and obligations incurred in connection with Seller's delivery of products *in the ordinary course of business*, including related to customer claims for cargo damages or loss, or related to property damage incurred in the ordinary course of business in connection with the delivery of products."[174]

The upshot is that the APA allocates Manna's pre-Closing liabilities to Sellers—except for all "Services Liabilities" which Pilot assumes up to the net working capital target.[175] Pilot has not alleged the GE liability would cause Services Liabilities to exceed the net working capital target. This means the parties' dispute turns on whether (or not) it is reasonably conceivable the GE liability is something other than a "Services Liability."[176] To put an even finer point on the disagreement, I must decide whether it is reasonably conceivable that GE's set-off of $69,440— caused by "shipment issue[s]"—is a liability "incurred in connection with [Manna's]

---

[173] APA § 3.1(c).

[174] APA § 12(aa) (definition of "Services Liabilities") (emphasis supplied).

[175] *See* APA §§ 3.1–3.2.

[176] APA § 3.1(c) (stating Pilot assumed all "Services Liabilities to the extent of . . . the Final Net Working Capital").

delivery of products in the ordinary course of business" (i.e., a "Services Liability").[177]

If the GE liability *is* a "Services Liability," then the GE liability is Pilot's to bear as an "Assumed Liability."[178] While Pilot has pled nothing more about the GE liability than a vague reference to its origin ("shipment issues") and its amount, I am satisfied there exists a "reasonably conceivable set of circumstances susceptible of proof" in which a reasonable factfinder could conclude the GE liability was incurred outside the ordinary course of business.[179] As such, it is reasonably conceivable that Pilot is entitled to indemnification for the GE liability as an Excluded Liability under Section 3.2, and Pilot has stated a viable (albeit narrow) claim for breach of contract on that basis.

## B. Pilot's Implied Covenant Claim (Count III)

In Count III, Pilot alleges Sellers breached the implied covenant of good faith and fair dealing by:

> (i) intentionally misrepresenting and omitting material information in order to fraudulently induce Pilot into signing the Asset Purchase Agreement and to subsequently close the acquisition; (ii) falsely engineering its disclosures to misrepresent and overstate customer revenue; (iii) intentionally delaying making disclosures and making disclosures that are intentionally ambiguous and misleading;

---

[177] APA § 12(aa) (definition of "Services Liabilities").

[178] *Id.*

[179] *CML V, LLC v. Bax*, 28 A.3d 1037, 1040 (Del. 2011).

(iv) manipulating [Manna's] gross revenue calculations to reflect a time period that did not fairly and accurately portray the financial condition of Manna prior to closing; and (v) refusing to execute the joint written instructions in order to release the Escrow Property.[180]

While the laundry list of generalized grievances is lengthy, Count III rests on the same factual allegations that support Pilot's breach of contract claims.[181] And for that reason, none of the grievances can sustain a viable claim for breach of the implied covenant.

The implied covenant of good faith and fair dealing "involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[182] Courts will not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."[183]

Each of Pilot's implied covenant allegations fails for two reasons. *First*, Pilot cannot state a viable implied covenant claim by recycling its allegations that Sellers

---

[180] APA § 120.

[181] Compl. ¶¶ 111–124 ("Sellers covenanted that [they] would act in good faith to provide accurate and truthful representations.").

[182] *Nemec v. Schrader*, 991 A.2d 1120, 1125 (Del. 2010).

[183] *Id*. at 1126.

breached express provisions in the APA.[184] It is black letter law that where the APA "expressly addresses a particular matter" (such as Manna's top Customers and the absence of Business Reduction Notifications), Manna cannot salvage its untimely breach of contract claims by recasting them under the implied covenant.[185]

*Second*, and relatedly, Pilot has not identified a "gap that the implied covenant might fill."[186] Pilot would have the Court infer a "free-floating duty," unattached to the APA, requiring Sellers to "provide accurate and honest representations of Manna's financial condition."[187] Specifically, Pilot takes issue with Sellers' strategic negotiation of the Customer Rep (by only agreeing to disclose Manna's top customers in 2017 rather than 2018), and argues this negotiation tactic amounted to bad faith "manipulat[ion]" of the "substance and timing" of Sellers'

---

[184] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *10 (Del. Ch. Dec. 22, 2010) (finding implied covenant claim not available when "the subject at issue is expressly covered by the contract") (internal quotations & citation omitted); *see also Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015) ("Where the contract speaks directly regarding the issue in dispute, existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain.") (internal quotations and citation omitted).

[185] *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *12 (Del. Super. Ct. Aug. 7, 2019) ("Where a contract expressly addresses a particular matter, 'an implied covenant claim respecting that matter is duplicative and not viable.'") (quoting *Edinburgh Hldgs. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018)).

[186] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. June 20, 2014).

[187] PAB at 39; *Longerman v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010) ("Implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents.").

disclosures.[188] If the implied covenant worked to circumvent carefully negotiated representations and warranties in this manner, then it could be weaponized by any dissatisfied deal party to re-trade the deal regardless of what was bargained-for. That is not how contractarian expectations or the implied covenant work.

Contrary to Pilot's argument, it is precisely because the parties carefully negotiated the "substance and timing" of Sellers' representations and warranties that Pilot cannot identify a gap within which the implied covenant might fit.[189] Indeed, the representations and warranties Sellers are alleged to have breached served an "important risk allocation function" regarding the possibility that Manna's financial position would deteriorate before Closing.[190] Because the parties explicitly addressed the issues about which Pilot now complains, the implied covenant cannot

---

[188] PAB at 39; *see, e.g.*, APA § 5.27 (requiring disclosure of the Company's to customers for "calendar year 2017").

[189] *See* PAB at 39.

[190] *In re Tibco*, 2014 WL 6674444, at *18 (discussing the role of representations and warranties in "heavily negotiated" agreements and their "important risk allocation function") (internal quotations omitted); *see also Emp.'s Ret. Sys. of City of St. Louis v. TC Pipelines GP, Inc.*, 2016 WL 2859790, at *6 (Del. Ch. May 11, 2016) ("The Courts apply the implied covenant . . . cautiously to infer contractual terms or gaps to address situations that the contracting parties did not anticipate.").

"create rights that contradict an express contractual provision" of the APA.[191] Count III fails as a matter of law.

### C. Fraud Claims (Counts IV-VI)

Even though Pilot packages its fraud claims in three, separate counts, it is hard to tell them apart—not only from each other, but also from the breach of contract claims I have addressed above. In Counts IV–VI, Pilot alleges that the same course of conduct underlying its breach of contract claims also gives rise to actionable fraud, fraudulent inducement and negligent misrepresentation.[192] In response, Sellers maintain all of Pilot's fraud claims should be dismissed because they (i) are untimely, (ii) impermissibly bypass the APA's non-reliance provision, (iii) fail to plead fraud with particularity as required by Court of Chancery Rule 9(b) and (iv) are duplicative of Pilot's breach of contract claims.[193] I address each argument *seriatim*.

---

[191] *Great-West Inv'rs LP v. Thomas H. Lee P'rs, L.P.*, 2011 WL 284992, at *5 (Del. Ch. Jan. 14, 2011); *see* APA § 5.8 (captioned "Absence of Changes"); § 5.27 (requiring notice of Business Reduction Notifications).

[192] *See* Compl. ¶ 127(a) (alleging representations regarding Modus were false), ¶ 129 (alleging representations in Section 5.6, 5.8, 5.24 and 5.28 were false), ¶¶ 139–54, 156–65 (similar); *see also Fortis Advisors*, 2015 WL 401371, at *9 (noting that "a claim for negligent misrepresentation is often referred to interchangeably as equitable fraud").

[193] DOB at 44–52, 54–55.

## 1. The APA Does Not Unambiguously Require Pilot's Fraud Claims to be Brought Within 15 Months

Before turning to the other aspects of Pilot's fraud claims, I address Sellers' threshold argument that Pilot's fraud claims are untimely. "Delaware's statute of limitations for claims sounding in fraud . . . is three years."[194] Even though Pilot has brought this action within the statutory limitations period, Sellers argue that Section 9.3 not only bars Pilot's breach of representation and warranty claims (as discussed above), but also requires dismissal of Pilot's fraud claims.[195]

Sellers concede that no Delaware court has adopted this line of reasoning, but urges the Court to embark on a three-step analytical expedition to reach their heretofore-uncharted destination.[196] *First*, the default rule in Delaware is that representations and warranties do not survive closing.[197] A survival clause, in essence, gives breath to any claim predicated on a party's representations and warranties only for as long as the clause allows. *Second*, Pilot promised not to rely on any statements about the Company other than those embodied in Sellers'

---

[194] *Winklevoss Capital Fund, LLC v. Shaw*, 2019 WL 994534, at *5 (Del. Ch. Mar. 1, 2019) (citing 10 *Del. C.* § 8106).

[195] Telephonic Oral Arg. on Defs.' Mot. to Dismiss (D.I. 34) at 18–20.

[196] *Id.*

[197] *Bear Stearns*, 2015 WL 139731, at *14 ("Absent contract language providing to the contrary, pre-closing representations about the acquired property interest become ineffective post-closing.").

contractual representations and warranties.[198]  *Third*, in the APA, Pilot agreed that

Sellers would have "no Liability for *any claims* made after the expiration" of the 15-

month survival period "for breach of *or an inaccuracy when made* of a representation

or warranty."[199]  Together, Sellers argue these three steps lead to the inescapable

conclusion that Pilot's fraud claims, which must be based on Sellers' representations

and warranties in the APA, come too late.[200]  In other words, while Delaware law

does not permit a party to "'lie' intentionally" in a contract, and a non-reliance

provision cannot bar claims for "intentional fraud" predicated upon knowing

falsehoods in a party's "written representations," nothing in our law prohibits a party

from agreeing not to bring such a claim after a prescribed limitations period

expires.[201]

---

[198] APA § 9.3.

[199] *Id.* (emphasis supplied).

[200] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003) (stating a plaintiff must plead he "acted or did not act in justifiable *reliance* on" defendant's representation) (emphasis supplied).

[201] *See Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1062 (Del. Ch. 2006) (cited approvingly in *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 116 (Del. 2012)) (stating "there is little support for the notion that it is efficient to exculpate parties when they lie about the material facts on which a contract is premised" (*i.e.*, contractual representations and warranties); *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *17 (Del. Ch. June 29, 2020) (discussing "intentional fraud" claims generally and stating that, even though plaintiffs "expressly represented . . . that they were not relying on any extra-contractual representations," their "fraud claims may proceed based on the written representations in the SPA").

I do not dwell on the soundness of Sellers' argument because the APA does not purport to limit "intentional fraud" claims to a 15-month contractual limitations period. While Section 9.3 does provide that Sellers will have "no Liability for *any claims*" based upon "breach" or "inaccuracy" of their representations and warranties beyond 15 months,[202] Section 9.1 makes clear that "[n]othing in this Agreement shall limit" Pilot's right to recover "any amounts at *any time* in connection with *any action* or claim based upon intentional fraud by [Sellers] in this Agreement."[203]

Section 9.1 can be reconciled with Section 9.3 because the former expressly trumps the latter's broad language when it states "*nothing in this agreement*" shall limit Pilot's right to bring a claim for "intentional fraud."[204] At some point, in another case, this court may be called upon to assess the enforceability of a party's unambiguous promise to bring intentional fraud claims only within a contractual limitations period, but the APA does not call this question. Indeed, Section 9.1 unambiguously *preserves* Pilot's right to bring intentional fraud claims "at any time."[205] Given this clear language, Sellers cannot credibly argue that Pilot's intentional fraud claims are untimely.

---

[202] APA § 9.3 (emphasis supplied).

[203] APA § 9.1 (emphasis supplied).

[204] *Id.*

[205] *Id.*

## 2. The APA Precludes Extra-Contractual Fraud Claims

Sellers read the APA as precluding fraud claims based on extra-contractual promises, representations or warranties.[206] I agree.

In his seminal *Abry Partners* decision, then-Vice Chancellor Strine reinforced this court's dedication to upholding the "free will" of sophisticated parties by enforcing non-reliance provisions like those in the APA.[207] *Abry* offers the following guidance: do not disavow reliance on extra-contractual statements unless you mean it.[208] If a sophisticated party agrees he is relying *only* on those representations and warranties in a written contract, and says as much in the contract, he "may not reasonably rely on information that [he] contractually agreed did not form a part of the basis for [his] decision to contract."[209] With this in mind, this court does not hesitate to dismiss fraud claims premised on extra-contractual representations when the parties' contract contains an unambiguous mutual covenant

---

[206] *See* DOB at 46.

[207] *Abry*, 891 A.2d at 1058.

[208] *Id*. ("The enforcement of non-reliance clauses recognizes that parties with free will should say no rather than lie in a contract.").

[209] *H-M Wexford*, 832 A.2d at 142 n.18; *see also ev3, Inc. v. Lesh*, 114 A.3d 527, 529 n.3 (Del. 2014) ("Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce."); *RAA Mgmt.*, 45 A.3d at 118–19 ("*Abry Partners* accurately states Delaware law and explains Delaware's public policy in favor of enforcing contractually binding written disclaimers of reliance on representations outside of a final agreement of sale or merger.").

that neither relied upon extra-contractual promises in connection with their decision to enter the contract or to make (or receive) promises within the contract.[210]

In Section 9.8, Pilot agreed Sellers did not make and "shall not be deemed to have made, any [] representations or warranties, written or oral, statutory, express or implied."[211] And Pilot "EXPRESSLY WAIVE[D] AND AGREE[D] THAT IT IS NOT RELYING ON, ANY REPRESENTATION OR WARRANTY" (other than those embodied in the APA) whether "EXPRESS" or "IMPLIED."[212] In other words, if Sellers did not say it in the APA, as a matter of law, it was not said. In a futile effort to escape the legal consequence of its promise, Pilot attempts to expand the universe of statements (or omissions) on which it is entitled to rely in two ways; neither are persuasive.

*First*, Pilot argues the non-reliance provision does not extend to "Pilot's fraudulent omission and concealment claims" because Pilot did not disclaim reliance

---

[210] *Abry*, 891 A.2d at 1057.

[211] APA § 9.8.

[212] *Id.* (emphasis in original); *see also id*. (Pilot "expressly waives and relinquishes any and all rights, claims and causes of action against the [Sellers] . . . in connection with, the accuracy, completeness or materiality of any statements, information data or other materials (written or oral) or documents heretofore furnished or made available to [Pilot] . . . by or on behalf of the [Sellers.]"); APA § 14.4 ("This Agreement . . . constitutes the entire agreement between the parties with respect to the subject matter hereof . . . and supersede any prior understandings, agreements, or representations and warranties by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof or thereof.").

on the "omission" of information or the "completeness" of the information in Sellers' representations and warranties.[213]  Wrong.  Pilot promised not to rely on the "*completeness* or materiality of any statements, information, data or other materials (written or oral) or documents heretofore furnished . . . to [it]."[214]  This non-reliance provision is unambiguous, explicit and comprehensive; Pilot "forthrightly affirm[ed] that [it was] not relying upon any representation or statement of fact not contained [in the contract]," including whether any statement was "complete."[215]

---

[213] PAB at 49.

[214] APA § 9.8 (emphasis supplied, original in all caps).

[215] *Kronenberg v. Katz*, 872 A.2d 568, 591 (Del. Ch. 2004); *see also Infomedia Gp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *8 (Del. Super. Ct. July 31, 2020) ("[T]he *TransDigm* court distinguished its holding from other Delaware precedent on the basis that the anti-reliance clause at issue did not refer to 'omissions' and did not disclaim the 'accuracy or completeness' of information provided in due diligence.") (citing *TransDigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *8 (Del. Ch. May 29, 2013) ("There is no argument, however, that Alcoa agreed in the Purchase Agreement that TransDigm was making no representation as to the 'accuracy and completeness' of the information TransDigm provided to Alcoa.")); *RAA Mgmt.*, 45 A.3d at 115 (addressing a non-reliance provision including "completeness" language, "RAA acknowledged that . . . Savage would have no liability, and could not be sued, for any allegedly inaccurate or incomplete information provided by Savage to RAA during the due diligence process."); *Infomedia*, 2020 WL 4384087, at *8 ("That express repudiation of the validity and completeness of information provided during due diligence distinguishes the Purchase Agreement from the stock purchase agreement at issue in *TransDigm*."); *Wind Point P'rs VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *17 (Del. Super. Ct. Aug. 17, 2020) (noting that in the absence of an "accuracy and completeness" clause, "Wind Point has adequately pleaded fraudulent concealment in the Complaint" notwithstanding the non-reliance provision).  I note that some aspects of *TransDigm* have been questioned (or, at least, distinguished) by some Delaware authority—*see, e.g.*, *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 54 (Del. Ch. 2015) (noting that "[t]o the extent *TransDigm* suggests that an agreement must use a magic word like "omissions," then I respectfully disagree with that interpretation"—but *TransDigm*'s

Pilot concedes that when there is "an express waiver with respect to the accuracy or completeness of the information provided," all extra-contractual fraudulent omission claims are waived.[216] As illustrated in *TransDigm*, where the parties elect not to include a "completeness" provision in their non-reliance clause, they are expressing an intent not to include fraudulent omission claims within the prohibitive scope of the clause.[217] Their decision to include the "completeness" language, on the other hand, exemplifies an unambiguous intent to preclude extra-contractual fraudulent concealment and omission claims.[218]

*Second*, Pilot argues that Sellers deceptively negotiated limitations on the scope of the Customer Rep, thereby rendering those pre-contract negotiations fraudulent and yet not barred by the non-reliance clause because they resulted in a knowingly false contractual promise.[219] I gather the theory is that while the APA was being negotiated, Pilot requested a representation of the Company's 30 largest

---

observation regarding the effect of "completeness" language has not been questioned and, in my view, the court got the construction of a non-reliance clause with that language just right.

[216] PAB at 49 ("Delaware Courts have long held that even when a buyer promises not to rely on representations outside a contract, this does not waive otherwise-viable claims for fraudulent omissions in the absence of . . . 'an express waiver with respect to the accuracy or completeness of the information provided by the Defendants.'").

[217] *TransDigm Inc.*, 2013 WL 2326881, at *8.

[218] *Id.*; *RAA Mgmt.*, 45 A.3d at 115; *Wind Point*, 2020 WL 5054791, at *17.

[219] Compl. ¶¶ 45–50.

55

customers during 2018—which would have revealed falling revenue attributed to Modus, Personal Comfort and Big Fig.[220] Sellers allegedly recognized that a top customer list for 2018 would torpedo the deal, so they pushed Pilot to agree that the top customer list would be limited to 2017. This dynamic, according to Pilot, takes the non-reliance clause out of the picture.

Pilot misapprehends the scope of the clause it agreed to as interpreted under our law. If a dissatisfied buyer could bring a fraud claim against a seller for *truthful* representations and warranties that allegedly are the product of a failure to "fairly and accurately portray the financial condition" of a company, non-reliance provisions would be meaningless, and sellers would have a free-floating (legally enforceable) duty to disclose any and all information relevant to a company's value, whether asked for or not.[221] If critical information lurks within the interstices of a

---

[220] *Id.*; ¶ 127(f) (alleging Sellers fraudulently "manipulate[ed] [Manna's] gross revenue calculations to *reflect a time period that did not fairly and accurately portray* the financial condition of Manna prior to closing.") (emphasis supplied); PAB at 47 ("Pilot seeks fraud damages because it has discovered damning emails that reveal that Sellers intentionally manipulated and *engineered the disclosures* in the APA to misrepresent the true status of Manna's pre-Closing customer relationships.") (emphasis supplied).

[221] Compl. ¶ 127(f). Indeed, if a seller negotiated an agreement with *no* representations and warranties, a dissatisfied buyer could bring a claim for fraud arguing (as Pilot does here) that the seller had "engineered" its disclosures to "misrepresent the true status" of the Company. PAB at 47.

counterparty's *truthful* representations and warranties, a sophisticated party has a means to flush that out: negotiate for more fulsome disclosures, full stop.[222]

The net effect of an enforceable non-reliance provision and carefully negotiated representations and warranties is to "define what information the Buyer relied upon in deciding to execute the Agreement."[223]  In connection with Pilot's investigation of the Company's value, each representation and warranty is like a piece of a puzzle that Sellers placed on the puzzle table for Pilot's benefit.  Once Pilot was satisfied it had seen enough of the picture, it stopped negotiating for additional puzzle pieces and agreed to purchase the Company.[224]  Of course, each of the individual puzzle pieces must be free from defect so that the image depicted is true.  But now that Pilot has assumed control of the Company after assembling the puzzle to its satisfaction, it cannot construct a fraud claim upon the notion that it

---

[222] For example, if a seller represents that a car has not been crashed any time during 2012–2017 or 2019–2020, and a buyer purchases a car promising to rely *only* on that representation, the buyer cannot bring a fraud claim if the car was, in fact, crashed during 2018.  In the face of a non-reliance provision, the parties' representations and warranties "form[] the reality upon which the parties premise[] their decision to bargain." *Abry*, 891 A.2d at 1058.  With that said, nothing here should be read as prohibiting a buyer from presenting evidence of extra-contractual omissions as part of its broader presentation in support of a contractual fraud claim.  The point is that the omissions, themselves, cannot be the bases of fraud claims when the contract contains a non-reliance clause as broad as the one in the APA.

[223] *Id*. at 1041.

[224] *Id*. at 1058 (Representations and warranties "form[] the reality upon which the parties premised their decision to bargain.").

needed more, or different, pieces in the APA to see the full picture.[225] Aggressive

bargaining is not fraud.

### 3. Pilot Has Pled Contractual Fraud With Particularity

Having determined that Pilot may only rely upon the representations and

warranties within the APA to state a claim for fraud, I address the Sellers' third

ground for dismissal—that Pilot has failed to plead fraud with the particularity

required by our law. The *prima facie* elements of fraud are well settled:

> (1) the defendant falsely represented or omitted facts that the defendant
> had a duty to disclose; (2) the defendant knew or believed that the
> representation was false or made the representation with a reckless
> indifference to the truth; (3) the defendant intended to induce the
> plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable
> reliance on the representation; and (5) the plaintiff was injured by its
> reliance.[226]

To meet the particularity requirement, Rule 9(b) often will require a plaintiff

making a fraud claim to allege: "the time, place, and contents of the false

representation, the identity of the person(s) making the representation, and what he

intended to obtain thereby."[227] "When a party sues based on a written contract, as

---

[225] *Cf.* Compl. ¶ 127(f); PAB at 42 ("Sellers fraudulently manipulated the disclosures they made regarding the status of Manna's customer relationships to make it appear that the business was worth more than it actually was in order to induce Pilot to purchase Manna at an inflated price." (citing Compl. ¶¶ 37–49, 67, 72, 129–133, 142–48, 150)).

[226] *Abry*, 891 A.2d at 1050.

[227] *Wexford*, 832 A.2d at 145; *see also Trenwick Am. Litig. Tr. v. Ernst & Young LLP,* 906 A.2d 168, 207–08 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (noting that the relevant factors include "the time, place,

[Pilot] has done here, it is relatively easy to plead a particularized claim of fraud."[228] "The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract."[229] Given that state of mind and knowledge may be averred generally when pleading fraud, an allegation that a contractual representation is knowingly false typically will be deemed well pled (even if ultimately difficult to prove).[230]

The Complaint well-pleads that Sellers made three knowingly false statements in the APA that conceivably amount to fraud.[231] *First*, Pilot alleges Sellers stated in

---

and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation").

[228] *Prairie Capital*, 132 A.3d at 62; *see also Swipe Acq. Corp. v. Peter M. Krauss, et al.*, 2020 WL 5015863, at *9 (Del. Ch. Aug. 25, 2020) (same).

[229] *Prairie Capital*, 132 A.3d at 62; *see also Swipe*, 2020 WL 5015863, at *9 (same).

[230] *Abry*, 891 A.2d at 1050.

[231] Pilot's allegations with respect to Forward Air fall short of a viable fraud claim. Pilot alleges that Sellers disclosed that Forward Air, a vendor of Manna, had increased its prices and made it seem as if "the price increase had already occurred and was already reflected in the Interim Balance Sheet." Compl. ¶ 80. Pilot stops short of alleging that the balance sheet or income statements themselves were fraudulent, instead insisting that Sellers intentionally misled Pilot into thinking "the price increase was already booked as an expense in Manna's Financial Statement." Compl. ¶ 82. Yet, nothing in either Schedule 5.28 or the related representation says or even implies the price increase was or was not reflected in the Interim Balance Sheet. And Pilot does not even generally plead that Sellers intended or had knowledge that the representation they made to Pilot regarding

59

the APA that Modus "decreased the volume of services purchased" from the Company "*in the ordinary course of business*."[232] In reality, Modus had decreased its purchases by "90%," a reduction that "can hardly be considered 'ordinary course.'"[233]

*Second*, Sellers disclosed in the APA that Personal Comfort "no longer purchases services from" the Company "in the ordinary course of business."[234] This statement is alleged to be false because Sellers knew Personal Comfort's decision to terminate its business with Manna was anything but "ordinary course." Instead, the

---

the price increase was false when made. Even if Sellers had knowledge of a price increase, this does not support an inference they knew that their disclosures gave the impression that the price increase had already occurred. It is not surprising, therefore, that the Complaint makes no such allegation. The fraud claim based on allegedly manipulated "gross revenue calculations to reflect a time period that did not fairly and accurately portray the financial condition of Manna prior to Closing" also fails. Compl. ¶ 127f. Pilot fails to cite a single case where the court found a plaintiff had pled a viable fraud claim based on revenue calculations that were the subject of highly fluid negotiations between the parties. Pilot could have negotiated for access to gross revenue calculations for the time periods in question, but it surely cannot blame Sellers for failing to give it something that it did not bargain for in the agreement. Finally, the fraud claim based upon Big Fig's accounts receivable likewise fails to state a claim. The Updated Disclosure Schedule plainly refutes that the Sellers "had actual knowledge that the full amount of the receivable was uncollectible." Compl. ¶ 74; DOB, Ex. 2 at 28. The schedule indicates that Big Fig had in fact paid down some of its accounts receivable and Pilot alleges nothing to suggest that Big Fig had given any indication the payments would stop. DOB, Ex. 2 at 28.

[232] Compl. ¶ 49.

[233] *Id.* (emphasis in original).

[234] Compl. ¶ 64 (emphasis omitted).

abrupt departure "resulted from, among other things, 'several failures that went horribly wrong.'"[235]

*Third*, Pilot alleges Sellers represented they had not received a Business Reduction Notification from Big Fig even though Big Fig "advised Sellers prior to Closing that it no longer intended to be a customer of Manna's."[236] According to Pilot, Sellers affirmatively made "the false statement that Big Fig was Sellers' twenty-fourth largest customer . . . despite having Knowledge that Big Fig was no longer a customer at all."[237] While the APA makes no specific reference to "the size of various customers at any time after December 31, 2017,"[238] Section 5.27 of the APA does provide that "neither Seller nor Owner has received written notice or, to the Knowledge of the Seller, any oral notice from any Material Customer that any Material Customer intends or expects, after the Closing Date, to stop or materially decrease" its business.[239] Pilot alleges Big Fig did precisely that, and that Sellers knew it when they made the Customer Rep.[240]

---

[235] Compl. ¶ 65.

[236] Compl. ¶ 72.

[237] Compl. ¶ 127c.

[238] DOB at 17–18.

[239] APA § 5.27.

[240] Compl. ¶ 127a–b. Sellers argue that "after the Closing Date" implies that if Big Fig notifies Sellers of their intent to end their relationship pre-Closing, that information need not be disclosed. APA § 5.27; DOB 30–32. Pilot responds that this is an "absurd" reading

Pilot has pled reasonably conceivable fraud claims regarding the status of Modus, Personal Comfort and Big Fig as Manna customers. Otherwise, its claims of contractual fraud are not well-pled and must be dismissed.

### 4. Pilot's Fraud Claims Are Not Bootstrapped Breach of Contract Claims

As has become customary in cases involving fraud claims asserted alongside breach of contract claims, Sellers argue Pilot's fraud claims must be dismissed because they are nothing more than "bootstrapped" breach of contract claims.[241] Delaware courts will find that improper bootstrapping has occurred when the plaintiff simply "add[s] the words 'fraudulently induced' or alleg[es] that the contracting parties never intended to perform" as a means to plead fraud in cases

---

of Section 5.27. PAB at 24. While I do not favor the characterization, I agree that Sellers' construction is unreasonable. Under Sellers' reading, even if Sellers knew pre-Closing that a major customer they had disclosed as in the fold had, in fact, left the fold, they would have no obligation to alert Pilot to that fact since Pilot bargained only for an assurance that a major customer would not leave after Closing. That is not what the contract says. Sellers also contend that Pilot categorically cannot rest its allegations of fraud with respect to Big Fig on mere "information and belief." Compl. ¶ 72; DOB at 51. I reject that argument as well. *See H-M Wexford*, 832 A.2d at 145–46 (allowing a fraud claim based upon "information and belief" to survive dismissal when plaintiff well pled "the representations [in a contract] were false when made" and "the defendants knew they were false"). Given the facts pled regarding the circumstances of Big Fig's departure, the Complaint places Sellers on heightened notice of the bases for Pilot's allegation that Sellers knew prior to Closing that Big Fig would cease doing business with Manna. Compl. ¶¶ 69–71, 75, 143.

[241] A key word search on the Westlaw™ Legal Research site, Delaware database, for "bootstrap! /s fraud!" revealed 64 hits as of this writing.

where the parties are bound by contract.[242] The bootstrapping is deemed improper because the plaintiff has simply tacked on conclusory allegations that the defendant made the contract knowing it would not or could not deliver on its promises.[243]

As our law in this area has evolved, it is now clear that improper bootstrapping does not occur: (1) "where a plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation,"[244] (2) "where damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim,"[245] (3) when the conduct occurs prior to the execution of the contract "and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction"[246] or (4) when the breach of contract

---

[242] *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998).

[243] *Swipe*, 2020 WL 5015863, at *11; *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020) ("A bootstrapped fraud claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud.").

[244] *Swipe*, 2020 WL 5015863, at *11; *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020) (recognizing that the bootstrapping rule does not apply where the plaintiff/buyer . . . can plead "either: (1) that the Seller knew that the Company's contractual representations and warranties were false; (2) that the Seller itself lied to Buyer about a contractual representation and warranty" or (3) because damages for fraud would be distinct from damages for breach of contract (quoting *Abry*, 891 A.2d at 1064)).

[245] *Swipe*, 2020 WL 5015863, at *11.

[246] *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *8–9 (Del. Super. Ct. July 31, 2017).

claim is not well-pled such that there is no breach claim on which to "bootstrap" the fraud claim. Pilot's fraud claims fall squarely within several, if not all, of these non-bootstrapping spaces.

At the outset, this clearly is not a case where Sellers are alleged to have entered into the APA with no intent to perform. According to Pilot, Sellers had every intent to sell Manna's assets. They just hoped Pilot would not discover that the business was not as valuable as Sellers represented it was. In this regard, Pilot has alleged with particularity three instances in which Sellers knew that its contractual representations with respect to its customers were false. Pilot alleges these statements were made in the APA to induce Pilot into Closing; a separate and distinct claim from any of its breach of contract claims.[247] And Pilot's fraud damages are arguably distinct from its breach damages. As the APA makes clear, Pilot's breach of contract damages are capped at the Escrow amount.[248] Finally, no breach of contract claim implicated by the fraud claims has survived dismissal. There is, therefore, no claim to which the fraud claims can be bootstrapped.

---

[247] Compl. ¶ 4.

[248] APA § 9.1; *Swipe*, 2020 WL 5015863, at *12 ("The anti-bootstrapping rule also does not apply here because Plaintiff might be entitled to greater damages through its fraud claim than its breach of contract claim.").

### III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss is GRANTED as to Counts I, II, III, and VI, except as to the breach of contract claim regarding GE and the "Excluded Liability." The Motion to Dismiss Count IV and V is DENIED, except to the extent the claims rest on alleged Forward Air price increases, manipulation of gross revenue calculations, the Big Figs accounts receivable or extra-contractual statements or omissions.

**IT IS SO ORDERED.**